Anthony T. LEE et al.,
Plaintiffs-Appellants,

United States of America, Plaintiff-Intervenor and Amicus Curiae,

National Education Association, Inc., Plaintiff-Intervenor Appellant,

v.

CHAMBERS COUNTY BOARD OF EDUCATION et al., Defendants-Appellees.

No. 75–3465.

United States Court of Appeals, Fifth Circuit.

May 28, 1976.

---

1. Detailed in *Acree v. (Drummond) County Board of Education*, 336 F.Supp. 1275 (S.D.Ga. 1972).

Donald V. Watkins, Montgomery, Ala., for plaintiffs-appellants.

Vaughan H. Robison, Montgomery, Ala., William O. Walton, Jr., Lafayette, Ala., for defendants-appellees.

Ira DeMent, U. S. Atty., Kenneth E. Vines, Asst. U. S. Atty., Montgomery, Ala., Richard F. Johnston, Justice Dept., Civil Rights Div., Ed. Section, Washington, D. C., for the United States.

Before GEWIN, GOLDBERG and DYER, Circuit Judges.

GEWIN, Circuit Judge:

This case arises from a motion for further relief filed in connection with state-wide school desegregation litigation. On February 12, 1970, a three-judge court entered an extensive order directing the Chambers County (Alabama) Board of Education (defendant or the Board) to implement a terminal-type desegregation plan. The order and plan incorporated the provisions óf *Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211 (5th Cir. 1970) (en banc), relating to faculty and staff desegregation and school site selection.

On April 16, 1975, plaintiff-intervenor National Education Association (plaintiff, appellant, or NEA) filed a motion for further relief. The issues tried by the district court concerned (1) the Board's failure to offer an administrative position to Harold Oliver, a black teacher; (2) the proposed site for a new vocational and technical school; and (3) two of the Board's proposed criteria for employment, promotion, and transfer of teachers and staff. A number of other issues were resolved by the parties. After a full hearing, the district court entered extensive findings of fact and conclusions of law. It found one of the Board's employment criteria defectively subjective, but on all other issues it ruled in favor of the defendant Board. NEA appeals from the court's judgment.[1] Finding no reversible error, we affirm.

I

Harold Oliver, an employee of the Chambers County School System for some twenty years, was transferred in the 1965–66 term from a classroom teaching position to that of Assistant Attendance Supervisor, a position funded through Title I of the Elementary and Secondary Education Act of 1965.[2] Oliver held this post until 1973, when the termination of Title I funding required the cancellation of all Title I employees' contracts; some twenty-five jobs were affected. Oliver was returned to a classroom teaching position with the same salary but with less responsibility than he had exercised as Assistant Attendance Supervisor.

At the end of the 1973–74 term, the County Attendance Supervisor, a white fe-

---

1. The Board does not challenge the court's rejection of the one deficient employment criterion.

2. 20 U.S.C. §§ 236 *et seq.* There is some dispute between the parties concerning Oliver's title and the scope of his duties. The District Court found that he was Assistant Attendance Supervisor and that his responsibilities were not limited to Title I schools or students, but extended to the whole public school system of the county. These findings are supported by ample evidence and are not clearly erroneous. Fed.R.Civ.Proc. 52(a).

male, resigned her position. Although Oliver was aware of the resulting vacancy, he did not apply for or express any interest in the job. Nevertheless, the Board considered Oliver for the position, along with four applicants, all white females. Of these five, only Julia Lowe, who was ultimately appointed, possessed the qualifications set out in the State Board of Education's guidelines for "in field" status. Conformity to the guidelines is one criterion for determining school accreditation.[3] NEA asserts that *Singleton* and Fourteenth Amendment considerations required the Board to offer the Attendance Supervisor position to Oliver, and it seeks an order directing Oliver's appointment and awarding back pay.

■ The district court found, and the Board does not dispute, that Oliver's transfer from the administrative post to the classroom was a "demotion" as that term is defined in *Singleton*.[4] There we established the following rule concerning dismissals or demotions necessitated by the transition from a dual to a unitary school system:

> If there is to be a reduction in the number of principals, teachers, teacher-aides, or other professional staff employed by the school district which will result in a dismissal or demotion of any such staff members, the staff member to be dismissed or demoted must be selected on the basis of objective and reasonable non-discriminatory standards from among all the staff of the school district. In addition if there is any such dismissal or demotion, no staff vacancy may be filled through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted, until each displaced staff mem-

ber who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so.

419 F.2d at 1218.

■ We had announced a similar principle two years earlier in *United States v. Jefferson County Board of Education,* 380 F.2d 385 (5th Cir.) (en banc), *cert. denied,* 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed.2d 104 (1967). The *Jefferson County* case stated explicitly the premise that is implicit in *Singleton*; it established specific rights of teachers "displaced *as a result of desegregation,*" 380 F.2d at 394 (emphasis added). *See Kelly v. West Baton Rouge Parish School Bd.,* 517 F.2d 194, 199 (5th Cir. 1975) (*Singleton* established rights of teachers " 'dismissed or demoted' as a result of desegregation"); *Ward v. Kelly,* 515 F.2d 908, 910 (5th Cir. 1975) (*Singleton* "established procedures to govern staff reductions upon integration of a school district"). *Singleton* was designed to ensure that the transition from a dual to a unitary system, with all the concomitant logistical problems, would not occasion unfair treatment of black teachers and staff members. Oliver's demotion from the position of Assistant Attendance Supervisor to that of classroom teacher was not a result of the desegregation of Chambers County schools, but rather was necessitated by termination of the Title I funds that paid his salary. He was not, therefore, entitled to preferential consideration or a right of first refusal of the Attendance Supervisor post. *See Blunt v. Marion County School Bd.,* 515 F.2d 951, 958 (5th Cir. 1975). The defendant Board employed objective, non-racial criteria in determining whom to hire for the position, and even considered Oliver for the vacancy, despite his failure to apply for or express

---

**3.** The parties are in considerable disagreement over the importance of these guidelines and the consequences to the school district if it had hired someone as Attendance Supervisor who did not meet the "in field" requirements. We conclude that our disposition of this issue renders unnecessary a resolution of these differences.

**4.** "Demotion" . . . includes any re-assignment (1) under which the staff member re-

ceives less pay or has less responsibility than under the assignment he held previously, (2) which requires a lesser degree of skill than did the assignment he held previously, or (3) under which the staff member is asked to teach a subject or grade other than one for which he is certified or for which he has had substantial experience within a reasonably current period.

419 F.2d at 1218.

interest in it. The district court correctly held that Oliver was not entitled to relief.

## II

The 1970 desegregation order, incorporating the pertinent *Singleton* requirements, provided that all school site selection, construction, and consolidation be done in a manner that would prevent the recurrence of a dual school structure. In March of 1975, the Board voted to locate a new vocational-technical school in Lafayette, which is in the geographical center of the county. This site was chosen over two other possible locations, in Lanett and Langdale, both of which are in what is called the Valley area in the extreme southeast corner of the county. The proposed school will serve eleventh and twelfth grade students from throughout the county; attendance will be voluntary.

The county has four high school attendance zones, with a school in each zone: Chambers County High School in Milltown (northwest quadrant); Five Points High School in Five Points (northeast quadrant); Lafayette High School in Lafayette (southwest quadrant); and Valley High School in Fairfax (southeast quadrant). The Lanett City School System, which is separate from the county system, operates Lanett High School, located in the southeastern quadrant at the extreme eastern boundary of the county. The Lanett system has made no definite commitment to the vocational school, but has indicated that it might participate if the school were located in the Valley area. It is undisputed that the majority of black high school students in the county system attend Chambers County, Five Points, and Lafayette high schools, while the majority of whites attend Valley High.[5] Approximately two-thirds of the county's high school students attend one of the Valley area schools, Valley High or Lanett High.

Among the factors that the Board considered in selecting the Lafayette site were the following: it is centrally located, thereby equalizing the transportation burden;[6] the land has been donated by the city; all necessary utilities are present at the site; easy highway access is available; paved access roads will be provided by the city; and fire and police protection are assured. The site was approved by the state Superintendent of Education, the Supervisor of Vocational Education, and the Appalachian Regional Commission, which has committed $400,000 for construction of the school, to be supplemented by a promised $200,000 from the state.

Appellant NEA contends that locating the school in Lafayette will not further desegregation but will result in a virtually all-black student population, whereas a Valley site would provide an integrated environment, particularly if the Lanett city system participates. Appellant asserts that the three sites are comparable in physical nature and availability, and that slightly less per pupil miles would be traveled if the school were located in the Valley area.

We agree with the district court the the Lafayette site will not tend to promote resegregation. *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 21, 91 S.Ct. 1267, 28 L.Ed.2d 554, 569–70 (1971). Appellant's contention that a Valley area site would provide a more integrat-

---

5. During the 1974–75 term, Chambers County, Five Points, and Lafayette high schools had a total of 522 black students and 118 white students in grades nine through twelve, while Valley High had a total of 242 blacks and 554 whites in these grades.

6. The defendant's evidence demonstrated that the distances from each of the county high schools to the Lafayette and Langdale sites are as follows:

| School | Lafayette Site | Langdale Site |
|---|---|---|
| Chambers County High | 14 miles | 27 miles |
| Five Points High | 12 miles | 26 miles |
| Lafayette high | 1.2 miles | 14.1 miles |
| Valley High | 15 miles | 4 miles |

Distances to the Lanett site were not provided; plaintiffs' exhibit 5 suggests that the Lanett site would be somewhat closer to Lafayette and Five Points than the Langdale site. Elvis Mor-

ed atmosphere is conjectural; attendance at the school is voluntary, and the racial make-up of the student body will be determined by who chooses to attend. Moreover, either of the Valley sites would impose an unequal transportation burden on students from other areas of the county, the majority of whom are black. *See United States v. Hendry County School Dist.,* 504 F.2d 550 (5th Cir. 1974). The Board's decision to construct the school on the Lafayette site was based on reasonable, logical, and permissible factors, and that location meets constitutional requirements, the mandates of this court's prior decisions, and the 1970 desegregation order.

### III

During the Board's presentation of evidence on the school site issue, NEA timely objected to and moved to exclude and strike defendants' exhibits 2, 3, 4 and 6 and all testimony based thereon. The challenged exhibits and testimony illustrated mileage and travel time of bus routes to the county schools (exhibit 2); additional mileage required to each proposed site (exhibit 3); total average distance to each site (exhibit 4); and transportation requirements of ninth through twelfth grade students to each site (exhibit 6). NEA asserts that exhibits 2 and 4 constitute written hearsay, and that none of the exhibits was supplied to counsel for plaintiffs and NEA prior to the trial date, as directed by the district court's pre-trial order. The court held the exhibits admissible under the "shop book" exception to the hearsay rule; to cure any surprise, it granted plaintiffs additional time to study the exhibits and introduce further evidence in rebuttal, but they declined the opportunity. NEA contends that admission of the evidence was error, and that there is insufficient competent evidence to support the court's judgment on the school site issue.

Exhibits 2 and 4, which are challenged as inadmissible hearsay, are collations of facts prepared by the county's superintendent, Morrow, based upon personal knowledge

gained through his own investigation and upon the school bus drivers' daily logs, which are kept in the course of the county's regularly conducted activity and turned over to the Supervisor of Transportation, who is directly responsible to the superintendent. *See* Rules 803(6), 803(8), Fed.R. Evid. Exhibits 3 and 6, to which NEA objects on the ground of surprise, provide merely cumulative evidence. In fact, the information contained in defendants' exhibit 3 may also be found in plaintiffs' exhibit 5, and defendants' exhibit 6 merely provides a more detailed breakdown by race and grade of statistics contained in plaintiffs' exhibit R.

■ It is settled that "[i]n non-jury cases an appellate court will not reverse for the erroneous reception of evidence unless there is an insufficiency of competent evidence, or the trial court was induced by incompetent evidence to make an essential finding it would not otherwise have made." *Cain v. Commissioner of Internal Revenue,* 460 F.2d 1243, 1244 (5th Cir. 1972). Thus, even assuming arguendo that the challenged exhibits were erroneously admitted, this is not ground for reversal. There was abundant competent evidence upon which the court below could base its decision regarding the school site. Appellant has demonstrated no prejudice resulting from the court's admission of the exhibits. Under the facts and in the circumstances of this case, any possibility of prejudice caused by the element of surprise was removed when the trial court offered the plaintiffs the opportunity, which they rejected, to study the exhibits and present additional evidence.

### IV

■ The district court approved with modification the Board's proposed objective criteria for employment, promotion, and transfers of teachers and staff. Appellant challenges the court's approval of the following item in the Board's proposal:

Potential for Working Harmoniously with Parents, Peers, Pupils, School Ad-

---

row, the County Superintendent of Education, testified that the Lanett site was not seriously

considered because it was not approved by the State Department of Education's survey team.

ministrators, Principals, Supervisors and Trustees as Indicated by Previous Employers and Others.

NEA contends that this criterion is impermissibly subjective and incapable of measurement by ascertainable standards. It may be that some future case will demonstrate improper application of the standard; in this respect, we note our reservations concerning the use of the words "and others." The Board's application of its criteria will be subject to strict judicial scrutiny. We perceive, however, no facial deficiency in the quoted criterion. The characteristic toward which it is directed is capable of objective assessment based on recorded reports concerning specific overt acts.

The judgment is affirmed.